The next case this morning is 20-1105, Janny v. Gamez. May it please the court, Charles Wayne for Appellant Mark Janny. There is no question that the government may not force a choice between going to church or going to jail, but that's what happened here. Mr. Janny, an atheist, spent 150 days in jail for refusing to participate in Christian worship while on parole. The court should reverse the decision below for three reasons. First, the district court erred in granting summary judgment when it disregarded competent admissible evidence of violations of both the establishment clause and the free exercise clause. Second, the court erred when it ruled that the Colorado parole officer, Appley Gamez, was entitled to qualified immunity. And third, the court erred when it ruled that the operators of the private religious program, Appley's Carmack and Constancy, did not act under Colorado law. With regard to the establishment clause claim. Let me just, what evidence did you put forward of Mr. Constancy's involvement with the state and knowledge of the relationship between Carmack and Mr. Gamez? Well, Judge McHugh, the following evidence was presented by Mr. Janny below. First, Mr. Constancy was present for that February 4, 2015 telephone call. That he was there and Mr. Carmack was there and they were speaking to Mr. Gamez about Mr. Janny's refusal to participate in the religious program. Mr. Constancy, even though he claims he didn't speak during the call, was in fact aware of what was said. And that's in the record. Second. And that's enough for him to be a state actor? There's more, Your Honor. As Mr. Janny stated in his verified complaint in his two sworn declarations, Mr. Constancy, like the other two Appley's, said to him, you're going to do the program or go to jail repeatedly. Moreover, Mr. Constancy proselytized Mr. Janny. He conducted the two Bible classes that Mr. Janny was forced to attend. Moreover, Mr. Constancy reprimanded Mr. Janny for skipping morning prayers in chapel. Is there any evidence that Mr. Constancy said, if you skip chapel, I'm going to make you go back to jail? Yes, there is. I'm sorry? That he said that? Or that he was in a room when somebody else said it? No. Mr. Janny's sworn statement is that both Mr. Constancy and Mr. Carmack said to you're going to do the program, meaning participate in religious services or go to jail. And that is at, that's in the first volume of the appendix, page 166, Mr. Janny's deposition, page one, page 73. So then in fact, there is evidence that Mr. Constancy said that very thing. Okay. So say he said it, he couldn't make him go back to jail. What if he didn't have that they all did in fact, if not authority, the three of them had the ability to do so because Mr. Janny was expelled from the program, expelled from the rescue mission, which was his required place of residence under the parole directive. As soon as that happened, Mr. Gamez was notified because Mr. Janny's electronic monitoring device was unplugged or the parole office was notified. Mr. Gamez had an arrest warrant issued. Mr. Janny was arrested. Mr. Janny was sent back to jail for an additional 150 days as a direct result of his refusal to participate in the Christian worship and other religious activities at the program. So you don't disagree that the mission can, you know, kick people out of the mission for not participating in the Christian activities, do you? No, we don't disagree with that. And you don't have any allegation that the state of Colorado controlled the rules up at the mission, do you? They, we do have no evidence of that, but the content of the program is the precise content. The fact that the state did not design the content of the program is as the, both the seventh circuit and the ninth circuit ruled in the cases we've cited to the court. That's of no moment because the state knew of the content of the program and required, in this case, the parolee to participate. The fact that they didn't design it doesn't matter. But how does that go to Carmack and Constantine? That goes to your other, your other defendant. That's correct. That goes to the parole officer. Okay. With, with regard to Carmack and Constantine, they, they agree and they admit on page 16 of their brief that there was a religious component to the program. That was the whole point of it. What they say is it effectively is, it really doesn't matter because we're, we're, we're private, we're private citizens and there's no state action. That goes to the state action point. And I'll address that now, if your honor would like. Well, let me ask, aren't they, if there's no state action, then they can have a religious content all they want and they can kick people out if they don't comply. So without state action, you admit you don't have a claim, right? Against the two, what we call the program defendants, Carmack and Constantine, that's correct. State action is required. And we have, we, and then we have argued there, as your honors know, there are four separate tests for state action. We, our position is the evidence set forth below satisfies, satisfies two of them, uh, both the joint action test and the nexus test. And that's been, and we did brief that and I'm happy to address that issue now, if your honors would like. Well, let me ask you a couple more questions. You don't contend that the, uh, missions being paid by the state or having, uh, for, for having your client there, right? That's correct. That's not in the record. And there was no contractual agreement between the state and, and the mission for having your client there. There was not, there was an informal arrangement between professor, between, uh, officer, a parole officer gammas and Mr. Carmack, who was a former parolee of, of Mr. Gammas. That's how, that's how the parolees. And in fact, as is in the record, previously only female parolees had participated in the program sent there by Mr. Gammas. Mr. Janney was the first and Mr. Carmack told him you're a Guinea pig and you're the first. And the plan is to expand this to include male parolees. Okay. Well, maybe how's that? How does that turn it into state action though? Maybe as part of their mission, they want to help people who are on parole, who are otherwise shut out from housing. They, that may, they may want that, but it's up to the state to provide a secular option. No secular option was provided to Mr. Janney. Well, they didn't have to take him. I mean, they, they offered a place, the states who, who made the decision that he could be placed there, not them. Your Honor's question goes to, your Honor's question goes to whether or not there, the evidence below satisfies the joint, satisfies the state action standard. And as the nominally private party and the alleged violation close enough so that the private party may be considered a state entity under section 1983 and that both the joint action test and the nexus test are satisfied here. And they were satisfied here because first of all, with regard to the joint action test, there was this informal arrangement. Number one, number two, when Mr. Janney, an atheist, objected to the Christian, required Christian worship that resulted in threats of jail from all three appellees, including the private appellees. There was this phone call on, during Mr. Janney's orientation on February 4th, 2015. There was a parole office meeting that Mr. Carmack drove Mr. Janney to and attended. And importantly at that parole office meeting, among the things that happened was Mr. Carmack, as promised to Mr. Janney, asked Mr. Gamis to change Mr. Janney's curfew from 430, I'm sorry, from six o'clock in the afternoon to 430. So, Mr. Janney would be present for evening prayers. Where, where is that in the record that Mr. Carmack asked that the, that it be changed? Because as I read it, he didn't ask that they be changed. He asked, he said he was going to be required to attend every night and that it was the parole officer's decision to change the curfew. That there was no explicit ask on the curfew. No, there, there was in fact an explicit ask, Your Honor. And I would certainly cite it in our brief one second. I don't have the precise site, but it is in our brief and there was a specific, the, the facts are these. At the orientation session, the morning of February 4th, Mr. Carmack said to Mr. Janney, I'm going to request that your curfew be changed from six o'clock to 430. They went to the meeting with Mr. Gamis that afternoon. He asked that it be changed. Mr. Gamis did in fact change it. And that's reflected in documentary evidence on the electronic log that records every event, recorded every event with regard to Mr. Janney's parole. And his curfew was changed that very day from six o'clock to 430. So there was an ask and there was an explicit ask that was done. And I see that as to Mr. Carmack, but I'm not seeing in the record that Mr. Constante did anything other than his job. And I don't see anything where he, that where he told your client that if he didn't go participate in the religious services, he would go back to jail. And I'm going to check, you gave me volume one, page 166, his depo at page 73, and I will read it again. But that's, I mean, that's my problem with state action is Mr. Constante. Well, I understand your owner's point, but that is certainly as part of it. But there is also evidence, as I mentioned before, both of the proselytization and also the fact that it was Mr. Constante who was, who conducted the Bible studies that Mr. Janney was forced to attempt. But that, I mean, you know, if, if I happen to be a minister in a church and I'm proselytizing and I'm putting on religious services and somebody else with state authority makes somebody come to my services, that doesn't make me liable under 1983. Well, it does if there's joint action between the state official and me, not somebody else, me. Agreed. And in fact, we say that there was in fact joint action, both in that telephone call placed during the orientation and Mr. Constante's later conduct having to do with, with the, we've cited your honor to the, to the deposition obviously under oath. In addition, the declarations, both the original one and the amended one also under oath state that Mr. Constante reprimanded Mr. Janney for skipping morning prayers and chapel. And as I said before, with regard to both, don't want to interrupt, but I think you wanted to reserve some time. I did your honor. Thank you so much. You might. Okay. Thanks. Council. Good morning. Before we begin, I just wanted to point out for the court that Mr. Lebsack and I are going to be splitting our time. So I'll take about the first nine minutes or so I'll discuss the claims against officer Gomez and Mr. Lebsack will speak specifically about the state action. That's fine. Just, just be careful of your time and cooperate. Thank you. May it please the defendant, officer John Gomez, your honors, the arguments presented by Mr. Janney make the case quite a bit more complicated than it really is. It ultimately is very simple, at least as far as the claims against officer Gomez are concerned. And there are three key facts in this case under which this court should affirm summary judgment in favor of officer Gomez. And require us to ignore the sworn statements of Mr. Janney. Well, the, the sworn statements by Mr. Janney, and I assume that that, that means the deposition testimony, anything that he submitted in support of the motion for summary judgment. And in that particular case and his verified complaint, our case law says can be treated like a declaration for purposes of summary judgment. Understood. So in that particular case, there are a number of statements that Mr. Janney makes which really formed the basis of his case. That, that, that case is not established anywhere else in the record. And broadly speaking, our position has been and continues to be that, that explanation that he gives about the circumstances under which he was housed in the Denver rescue mission and the circumstances under which he left the Denver rescue mission. All of that is essentially a post hoc rationalization, a post hoc explanation of what happened. There is not anything in the documentary record, which even remotely squares away with that explanation. You have these C wise logs that are extensive. They record every single interaction between a parolee and a parole officer or anyone at the parole board. And if there had been any sort of interaction, any, any discussion about being compelled to attend or participate in religious and religious programming, if there were any issues that Mr. Janney was, was trying to communicate with regard to that, that absolutely would have been somewhere in the documentary record. So ultimately that's the argument for the jury that says you should believe what we're telling you over what Mr. Janney is telling you, but it's not, it doesn't allow either. It doesn't allow the district court to discount the evidence put forward by Mr. Janney. And frankly, the probation long entry of Kate's management meeting on the afternoon of February 4th followed immediately by an entry changing Mr. Janney's curfew to 4 30 PM supports Mr. Janney's allegations of what happened at that meeting. So you can read that log either way, which is why we we don't just ignore sworn testimony at this stage. Well, in this particular case, the, the, the evidence again, that is presented by Mr. Janney is ultimately it is simply not in any way corroborated by, I'm sorry. It's not persuasive to you. It's not a matter of whether it's persuasive. I mean, there is case law that States when a, a, a litigants statements in support of emotional summary judgment are blatantly contradicted by the record such that no jury could believe it at that point. And I, we have never applied that outside the context of video recordings or other irrefutable evidence. We've never applied it in a situation of a, he said, he said. I, I, I understand what the court is saying, but there are a number of, of undisputed facts in this case, which alone would be sufficient to, to, to affirm summary judgment. And I'm just going to go through them real quick. So to begin with, there's no dispute that Mr. Janney was arrested and ultimately found to have violated his parole contract because he did not remain as residents of record every night, as he was required to do so by condition two of his parole contract. That's page 20 to 21 in the first volume of the appendix. In other words, he was found to have been in violation of his parole contract because he absconded, not because he violated the subsequently imposed condition that he was to abide by the rescue missions house rules, which by the way, we're not that that order was not specific as to having to participate in any of religious programming. Secondly, there is no dispute that officer Gomez's decision to require Mr. Janney to live at the Denver rescue mission was motivated by his belief based on his expertise in supervising parolees that he had to have been placed there because any of the other alternative residences would have not been conducive to him complying with his parole terms. And this was critical because if you look at the CY's logs, there was a history of Mr. Janney not complying. He had absconded. He had failed to obey curfews on numerous instances. He had failed to communicate with his parole officer as he was required to do. And finally, there's also, it's also the case that while Mr. Janney was ordered to live at the mission, we're not disputing that the order came down. He was not being compelled to live there in perpetuity. The relationship between a parolee and a parole officer is in fact, in many instances, it's collaborative. You can communicate, you can say, listen, I'm having an issue with what is going on at the Denver rescue mission. And in this particular case, it's just, it is unfathomable that if any of those conversations had actually taken place, that they would not have been in the, in the CY's logs. And if we apply the, these facts to the establishment clause claim or, and the free exercise clause claim, we can affirm summary judgment. And with regards to the establishment clause claim, this is true regardless of whether we apply the Lemon test, which has been generally applied by the circuit in the past, or the Lee test, which, which, which Mr. Janney would like us to apply. I mean, the Lee test, the proper test here, we're dealing with a coercion allegation. Well, the issue of whether, I mean, the outcome, it would be the same under either test. I mean, is there a coercive component to what to, to the order that Mr. Janney lived at the, at the Denver rescue mission? Yes, I suppose there is. But that's neither here, neither here nor there, because the result would be the same either way. So for instance, to pass constitutional muster on the Lemon test, a government action has to have a secular purpose, right? The secular purpose of placing Mr. Janney in the Denver rescue mission was... I think, I think we're looking at the Lee test. And so we're looking at the three prongs of the Lee test here, aren't we? Well, I'd be glad to address the Lee test for sure. So the Lee coercion analysis involves a three-step inquiry according to Kerr versus Ferry, which is what Appellant's counsel cited to in his main brief. First, has the state acted? Second, does the action amount to coercion? Third, is the object of the coercion religious or secular? So the word object is key there. What is the, the true purpose of this, of this order? And the order to have him live at the Denver rescue mission is to give him an appropriate place to live. It is not, it isn't, because he had not provided an alternate, an alternate place to live that would have been appropriate, that would have been conducive to him complying with, with parole, with, with checking in when he needs to, with making sure he stays out of trouble, which same goes with the decision to ultimately find that he was in violation of, of, of parole. That was not the, the object of that decision was not religious. It was secular. It was because he, by all accounts, absconded. He left without permission. But he can be properly in violation of parole and still have a valid claim under the free exercise clause or the establishment clause, can he? They're not mutually exclusive. No, they're not mutually exclusive, but he would still have to show that there was a religious rather than secular purpose for the decision. And in this particular case, whether you're talking about the placement or the removal, it was, it was secular in nature because, and with regards to the removal, uh, with, with, with the violation of parole, excuse me, in that particular case, um, the, the secular purpose was the fact that he was not found to be in violation of parole because he didn't follow the rules, whatever that may be, which could have been attending or participating in, in religious activities. But in this particular case, it was because purposes of the section 1983 act, we're not looking at his parole was violated. We're saying his first amendment right was violated. Right. But I mean, I believe the participate in the program. Right. Well, I, yes. Um, it's not that his parole was violated. That's not the, but what he's saying is that his first amendment right was threatened ultimately by being, uh, by having his parole violated. That is part of the claim. I think that's, that's the distinction that, that, uh, that Mr. Janney is trying to make. Um, and I am going, I'm mindful of my time here and I just wanted to make really quick remarks about the free exercise claim. So to, uh, to plausibly state a claim of religious discrimination, a plaintiff has to show evidence that the conduct and plaintiff did not occur for a neutral reason, but for the purpose of discriminating on account of religion, a claim that is based on discrimination. But if they're bringing a coercion claim, they don't have to prove that under free exercise, do they? Well, I guess that, that depends on how we are interpreting the claim. I mean, we, when we briefed it below it, we briefed it as a, uh, as an intentional religious discrimination claim. Uh, and now it's, it seems to have shifted a bit into a claim similar to, to Sherbert versus Verner. But again, in that particular case, um, we would just go back to, uh, point out that the, um, the, the documentation in the record is, is overwhelming that what Mr. Uh, Janney had said about officer Gomez's, um, motivations for placing him in the Denver estimation, the conversations you have with the co-defendants, uh, none of that is in any way played out by the, by the documentary record. And, uh, if there are no further questions, I will yield the rest of my time to Mr. Lepsek. Thank you. May it please the court. My name is John Lepsek and I represent defendants, Carmack and Constante, who were the employees of the Denver rescue mission in the short time that I have left. I want to focus on a few key facts and then compare this case to the Gallagher versus Neil Young concert case to show the very close parallels in the legal issues between this case and that case. So the district court got it correct. There was no state action in this case. The referral by Mr. Gamez to the mission was for housing. It had no component of, you must go there for religious instruction. The issue of the religious orientation did not come about until the day after Mr. Jenny arrived at the mission. So, uh, as Mr. Gamis states in his affidavit, it's a standard procedure in every referral to require housing and to require, uh, uh, following the house rules. So that's all that he did. So the rules that were set up by the mission were set up by them with no influence from the state. The state, uh, did not get involved in setting the rules. The mission set up the rules. So when, uh, Mr. Jenny arrived, he was following rules that had been set up solely by the mission. The mission had no contract with the state. It didn't receive any compensation. So let's, uh, compare this case to the Gallagher case and the Neil Young concert. So in the Neil Young concert case, the state of Utah's university leased its arena. And in the lease was a requirement for a pat-down. And the concert promoter hired a security company and the security company had a procedure to require pat-downs on admission to rock concerts. The university was aware of that. It was not part of the contract, but there was a meeting at the concert, at the venue, where a representative of the university was there and heard the plans for the pat-down. And the court, this, this circuit correctly held that that was mere acquiescence. The fact that the university knew about the pat-downs did not mean that there was joint action, did not mean that there was nexus, didn't mean that there was state action under any test. So it, the, the court held in Gallagher that there was no state action for the same reason. There's no state state action by either Mr. Carmack or Mr. Constante. Judge McHugh, you're correct. Judge, the involvement of Mr. Constante was very distant, but even looking at Mr. Carmack, there was no state action by him. It was the mission's own procedures. Mr. Gamez, the pro officer was aware of them, but he didn't do anything other than acquiesce. The, the mission did not have the authority to send somebody back to jail. I misspoke. They did have authority to expel, but they didn't have any authority to send anybody back to jail. So the state action of the decision to send him back to jail had nothing to do with what the mission did. So, and the reference to the conversation about the, uh, uh, setting the, the change in the, uh, curfew is in the record. May I give the site your honor? Thank you, counsel. Oh, that's we're aware of your citations. Thank you very much. We appreciate your time counsel. I believe you have a few minutes left. Yes. A couple of minutes. I do, uh, quickly, um, with regard to judge Carson's question about the curfew change where that is in the record, Mr. Carmack said that he would ask Mr. Gamez to change the curfew. That's in volume one at pages 31 and 32. That's the complaint. Mr. Carmack did in fact ask that the curfew be changed again. That's volume one, page 32, also volume one, page one 67 on page 83 of Mr. Janney's deposition. And in fact, Mr. Gamez did change the curfew. And that's volume one, page 1 67 again, page 83 of the deposition. And it's also in the electronic log of the parole, which is volume one, page 2 39. Um, with regard to the, there were questions about the, um, the rules of the program, um, by your honors, the parole directive stated that Mr. Janney was to abide by all house rules as established and that a violation would mean jail. And that's in the parole directive itself. That's volume one, page 2 51. Mr. In Mr. Janney's, uh, declaration, uh, at volume two, page four 11, he says that Mr. Gamez said to him, the rules of the program or the rules of your parole, including the religious ones. Then Mr. Gam is at the February 4th meeting in the afternoon. The second meeting that day said to Mr. Janney, you must follow the rules of the program or go to jail. And again, that's volume one, page 1 67 at page 83. Um, with regard to, uh, council citation of the, uh, Gallagher case, the Neil young concert, we've distinguished that in our brief. In that case, there was no action between the state and the private parties. There is evidence of joint action here. I've, uh, talked about, uh, uh, some of it already and the rest is certainly set forth in detail in our brief. And I see that my time is almost up. So we will submit any issues that I did not reach on the brief. Thank you. Counsel, your time has expired. Uh, Mr. Liebeck, I didn't mean to cut you off on your citation. If you had a citation that's not in your brief, uh, feel free to submit a letter to us with your proper citation. Thank you. Counsel counselor, Mr. Wayne gave the citation, so I won't need to do anything. All right, good enough. But if you do feel free, I mean, we're always open for business. Uh, thank you counsel for your arguments. Very well done. Uh, the case is submitted. Counselor excused.